IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 08-cv-02342-WYD-CBS

JOHN DOE,

    Plaintiff,

v.

MARGARET HEIL, in her official capacity as Acting Manager of the Colorado Department of Corrections Sex Offender Treatment and Monitoring Program; and ARISTEDES ZAVAROS [sic], in his official capacity as Executive Director of the Colorado Department of Corrections,

    Defendants.

**ORDER ON MOTION TO DISMISS**

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on Defendant's Combined Motion to Dismiss and Memorandum Brief in Support of Motion to Dismiss. Defendant moves to dismiss this case pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated below, the motion to dismiss is granted.

II.    <u>BACKGROUND</u>

This is a civil rights case filed pursuant to 42 U.S.C. § 1983 by a prison inmate. Plaintiff John Doe (hereinafter "Doe" or "Plaintiff") is a sex offender incarcerated in the Colorado Department of Corrections ("CDOC"). He is currently serving a sentence after pleading guilty to a sex offense. Defendant Heil is an employee of the CDOC and is the Program Administrator of the CDOC Sex Offender Treatment Program.

Doe asserts three claims in his Amended Complaint. In Claim One, Doe asserts a facial challenge to the CDOC Administrative Regulation requiring him to admit the commission of his sex offense and to take a polygraph examination to participate in sex offender treatment. (Am. Compl. at ¶¶ 29-30.) In Claim Two, he alleges that his Fifth Amendment right against self-incrimination was violated because he was required to take a polygraph examination and potentially make incriminating statements and/or admit to committing a sex offense in order to participate in sex offender treatment. Finally, in Claim Three Plaintiff asserts a Substantive Due Process claim alleging that the CDOC policy or regulation "is so egregious, so outrageous that it may fairly be said to shock the contemporary conscience of a federal judge." (*Id.* at ¶ 49). Doe seeks a declaration that the CDOC policy is null and void, prospective injunctive relief reinstating him into sex offender treatment, an order that he not be penalized for asserting his Fifth Amendment rights, as well as costs and attorney fees. (*Id.* at 12).

I initially dismissed all claims as barred by the statute of limitations by Order of September 28, 2009. Upon reconsideration, by Order of March 26, 2010, I affirmed dismissal of Plaintiff's claims as they pertain to termination from the Sex Offender Treatment Program. I reinstated "Plaintiff's claims as they relate to policies and/or alleged constitutional deprivations associated with the requirements of re-entry into the sex offender treatment program, *i.e.*, re-taking a polygraph and providing a sexual history." (March 26, 2010 Order, ECF No. 30 at 3-4). In that Order I noted that Plaintiff's claims relating to reinstatement may also be time barred. However, I reinstated the claims because I found that the allegations of the complaint are unclear

as to the date(s) Plaintiff refused to retake a polygraph and to provide his sexual history. (*Id.* at 3.)

Defendants move to dismiss all of Plaintiff's claims. First, Defendants argue that Plaintiff's claims are time-barred because they were not filed within two years of the date he knew or had reason to know of the injury which is the basis of this action. Second, Defendants argue that Plaintiff''s claims fail as a matter of law. They assert in that regard that the Fifth Amendment claim fails under applicable Tenth Circuit and other authority. They also argue that Plaintiff fails to state a liberty interest and that the prison's procedure is reasonably related to a legitimate penological interest. Finally, Defendants argue that the CDOC policy, and its application, cannot be said to "shock the conscience of federal judges." (Defendants' Combined Mot. to Dismiss and Memorandum Br. in Supp. of Mot. to Dismiss [hereinafter "Mot. to Dismiss"], ECF No. 33 at 14.) For the reasons stated below, I grant the Motion to Dismiss on the merits.[1]

III.   ANALYSIS

    A.   Standard of Review

The Federal Rules of Civil Procedure provide that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and

---

[1] Accordingly, I need not reach the argument that the claims are time-barred.

quotation marks omitted). "A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 1950. Under this standard I first address Plaintiff's second claim for relief under the Fifth Amendment and then turn to the other claims.

  B. Whether Dismissal is Appropriate

    1. The Fifth Amendment Claim (Claim II)

Plaintiff claims that his Fifth Amendment right against self-incrimination is violated by CDOC administrative regulations requiring convicted sex offenders to provide a full sexual history and pass an accompanying polygraph examination in order to participate in and/or be readmitted to the sex offender treatment program required for parole eligibility. (Am. Compl., ECF No. 3 at ¶ 45.) Plaintiff has taken and failed the polygraph examination on multiple occasions and was subsequently removed from the program. (*Id.* at ¶ 19.) The Fifth Amendment claim is based on Plaintiff's contention "that there is a risk that he would reveal past crimes other than . . . [his] conviction . . . , and that his admissions could then be used to prosecute him." (*Id.* at ¶ 40.) The CDOC

neither disputes this possibility nor offers Plaintiff any assurance of immunity for incriminating statements.

Analyzing the constitutionality of a prison policy involves a two-part test: (1) whether the "plaintiff alleged facts showing the violation of a constitutional right," and (2) whether the prison meets "the relatively limited burden of identifying the legitimate penological interests that justif[ied] the impinging conduct." *Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007) (citing *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006)) (modification in original)). Once the plaintiff has made the requisite showing of a violation of a constitutional right, the burden shifts to the defendant to identify the legitimate penological interests of the challenged policy. *Id.*

      a.  <u>Violation of a Constitutional Right</u>

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To establish a Fifth Amendment claim, an individual "must prove two things: (1) that the testimony desired by the government carried the risk of incarceration, and (2) that the penalty he suffered amounted to compulsion." *United States v. Antelope*, 395 F.3d 1128, 1134 (9th Cir. 2005) (internal citations omitted). Concerning the risk of incarceration, Plaintiff is entitled to an "infer[ence] that his sexual autobiography would, in fact, reveal past sex crimes . . . ." *Id.* at 1134–35. This being the case, and in the absence of an assurance of immunity from Defendants, I find that Plaintiff has adequately demonstrated the risk of incarceration.

The compulsion element of a Fifth Amendment claim is satisfied when the government threatens sufficiently adverse consequences to the choice to remain silent

as to compel an individual to speak in a potentially self-incriminating manner. *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977). However, not all adverse consequences constitute "compulsion".[2] In this case, Defendants argue, "The requirement that applicants disclose their past histories of sexual misconduct as a condition of participation in a sex offender treatment does not constitute compulsion even if there was reduced likelihood of parole for refusal to participate." (Mot. to Dismiss at 8.) In support of this proposition, Defendants cite several cases in which the court determined that requiring inmates to share their sexual biographies as part of a treatment program did not violate their Fifth Amendment rights. *See e.g,. Wirsching v. Colorado*, 360 F.3d 1191, 1203-04 (10th Cir. 2004) (holding that the denial of earned good time credits to an inmate for refusing to admit that he committed a sex offence did not violate his Fifth Amendment right); *Searcy v. Simmons*, 299 F.3d 1220, 1227–28 (10th Cir. 2002) (holding that the denial of eligibility for good time credits to inmate who refused to divulge his sexual history as required by a sex offender treatment program did not amount to unconstitutional "compulsion").

*Wirsching* and *Searcy* relied on the Supreme Court's analysis in *McKune v. Lile,* 536 U.S. 24 (2002). In that case, an inmate who refused to complete a sexual history questionnaire and undergo a polygraph examination as part of a sex offender treatment program lost privileges including "visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to a personal television, and other

---

[2] The United States Supreme Court has identified certain types of penalties that would amount to unconstitutional compulsion, including "termination of employment, the loss of a professional license, ineligibility to receive government contracts, and the loss of the right to participate in political associations and to hold public office." *McKune v. Lile*, 536 U.S. 24, 49–50 (2002) (O'Connor, J., concurring) (internal citations omitted).

privileges," and was transferred to a maximum-security unit.  *McKune*, 536 U.S. at 31.
In Justice O'Connor's concurring opinion, viewed by the Tenth Circuit as the holding in
*McKune*,[3] she identified the proper Fifth Amendment analysis as "whether the pressure
imposed in such situations rises to a level where it is likely to 'compe[l]' a person 'to be
a witness against himself.' . . . [S]ome penalties are so great as to 'compe[l]' such
testimony, while others do not rise to that level."  *Id.* at 49 (O'Connor, J., concurring).

Given the facts in *McKune*, Justice O'Connor concludes, "I do not believe that the
alterations in respondent's prison conditions as a result of his failure to participate in the
Sexual Abuse Treatment Program (SATP) were so great as to constitute compulsion for
the purposes of the Fifth Amendment privilege against self-incrimination."  She notes,
however, that had the potential penalty for not participating included "longer
incarceration," she may have reached a different conclusion.  *See id.* at 48–49, 52
(internal citations omitted).  As Justice O'Connor explains:

> [T]he proper theory should recognize that it is generally acceptable to impose
> the risk of punishment, however great, so long as the actual imposition of
> such punishment is accomplished through a fair criminal process.  Forcing
> defendants to accept such consequences seems to me very different from
> imposing penalties for the refusal to incriminate oneself that go beyond the
> criminal process and appear, starkly, as government attempts to compel
> testimony . . . .

*Id.* at 53 (internal citations omitted).

In the case at hand, Plaintiff faces a penalty significantly more serious than that
of the respondent in *McKune*.  The facts of the case are more akin to those of *United*

---

[3] "Because Justice O'Connor based her conclusion on the narrower ground that the [Kansas Department of Correction's] policy was not compulsion under the Fifth Amendment, we view her concurrence as the holding of the Court in *McKune*."  *Searcy*, 299 F.3d at 1225.

*States v. Antelope*, 395 F.3d 1128 (9th Cir. 2005).  In *Antelope,* the defendant's conditional release was twice revoked when he refused to share his sexual history during a sex offender treatment program without first being offered a guarantee of immunity.  395 F.3d at 1130.  The Ninth Circuit distinguished *Antelope* from *McKune*, arguing that the penalty of additional incarceration faced by the defendant in *Antelope* rose to the level of unconstitutional compulsion, and noted that Justice O'Connor "would not have found [such] a penalty of 'longer incarceration' . . . to be constitutionally permissible."  *Id.* at 1137-38.  The same holds true here:  the threat of longer incarceration via the loss of parole eligibility amounted to compulsion; thus, Plaintiff has made the requisite showing of a violation of his Fifth Amendment rights.

                b.        <u>The *Turner* Balancing Test</u>

While "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), the Supreme Court has "recognized . . . that these rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration."  *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (citing *Turner*, 482 U.S. at 85).  The Supreme Court resolved this tension in *Turner*, holding that, "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is [still] valid if it is *reasonably related to legitimate penological interests*."  482 U.S. at 89 (emphasis added).  Thus, once it is determined that a prison policy violates a constitutional right, the court must apply the balancing test set out in *Turner*.  *See Boles*, 486 F.3d at 1182; *Searcy*, 299 F.3d at 127 n.4.  This test requires the court to consider (a) whether there is a legitimate penological

interest at issue, and (b) whether the policy in question is reasonably related to that interest. *Turner*, 482 U.S. at 89.

### i. Legitimate Penological Interest

Legitimate penological interests include rehabilitation, deterrence and security. *Mosier v. Maynard,* 937 F.2d 1521, 1525 (10th Cir. 1991). The participation of sex offenders in rehabilitative programs has been recognized by the Supreme Court as a legitimate penological interest. *McKune,* 536 U.S. at 37. This Court has also noted that, "[I]t is beyond peradventure that the protection of children and the rehabilitation of sex offenders are legitimate penological interests." *DeRock ex rel. DeRock v. Cates,* No. 02-cv-02193-REB-CBS, 2006 WL 2943056, at *3 (D. Colo. Oct. 13, 2006) (citing *Overton v. Bazzetta,* 539 U.S. 126, 133 (2003); *Wirsching,* 360 F.3d at 1200). With this in mind, it is beyond reasonable dispute that the CDOC has a legitimate penological interest in having convicted sex offenders complete a treatment program before being released on parole. The next question, then, is whether the CDOC policy of requiring inmates to share their sexual histories is reasonably related to this legitimate interest.

### ii. Relationship of Policy to Penological Interest

Determining whether a regulation or policy is "reasonably related to legitimate penological interests" requires the court to consider the following factors: (1) whether there exists a "valid, rational connection" between the prison policy and a legitimate penological interest identified by the government; (2) "whether there are alternative means of exercising the right that remain open to prison inmates;" (3) what effect an accommodation of the asserted constitutional right would have on guards, other inmates, and prison resources; and (4) "whether an alternative is available which would

accommodate the prisoner's rights at a *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 89; *Mosier,* 937 F.2d at 1525.

*Connection to Legitimate Penological Interest.* In order for a prison policy to be constitutionally valid, only some "valid, rational connection" needs to be shown between the prison action and the underlying penological interest. *Frazier v. Dubois,* 922 F.2d 560, 562 (10th Cir. 1990). In addition, "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132.

The Tenth Circuit has recognized that, "[T]he state's interest in rehabilitating sex offenders is a valid one, and the requirement for admission of responsibility is considered a legitimate part of the rehabilitative process." *Searcy*, 299 F.3d at 1228 (internal citations omitted). In *Searcy*, the court noted, "The [Kansas Department of Corrections Sexual Abuse Treatment Program's] policy of requiring admission of responsibility and providing a sexual history is one central to its mission of rehabilitating sex offenders." *Id.* at 1227. The plurality in *McKune* also remarked that, "Acceptance of responsibility . . . demonstrates that an offender 'is ready and willing to admit his crime and to enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary.'" *McKune*, 536 U.S. at 36–37 (quotation omitted). Based on the foregoing authority, I find that the CDOC's administrative regulation requiring sex offenders to provide a sexual history and pass an accompanying polygraph test clearly has a 'valid, rational connection' to the legitimate penological interest of rehabilitating sex offenders.

*Alternate Means of Exercising the Right.* The *Turner* Court observed, "Where 'other avenues' remain available for the exercise of the asserted right, . . . courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Id.,* 482 U.S. at 90. However, Plaintiff's claim that the CDOC has alternative means of rehabilitating sex offenders without requiring a sexual autobiography is without merit. As already noted, the requirement that inmates in sex offender treatment programs reveal their sexual histories is a crucial component to the success of such programs, and the Tenth Circuit maintains that allowing offenders to proceed with the program without fulfilling this requirement "would eviscerate the [program's] legitimate rehabilitative process of accepting responsibility for past behavior. As such, it is not an alternative at all." *Searcy,* 299 F.3d at 1228–29.

*Effect of Accommodation of the Asserted Right on Others.* As just noted, the Tenth Circuit has already determined that allowing a sex offender to continue in a treatment program without requiring a sexual autobiography would "eviscerate" the rehabilitative process. *Id.* The plurality in *McKune* shared similar sentiments:

> Acceptance of responsibility is the beginning of rehabilitation. And a recognition that there are rewards for those who attempt to reform is a vital and necessary step toward completion. . . . If the State sought to comply with the ruling by allowing respondent to enter the program while still insisting on his innocence, there would be little incentive for other SATP [Kansas' Sex Abuse Treatment Program] participants to confess and accept counseling; indeed, there is support for Kansas' view that the dynamics of the group therapy would be impaired.

*Id.*, 536 U.S. at 47.

It is easy to imagine how allowing Plaintiff to continue in the sex offender treatment program without having to provide a sexual history could lead to all participants asserting a similar right regardless of whether they had a legitimate Fifth Amendment concern. Additionally, such an accommodation for a single participant could "detract from prison officials' ability to provide uniform and effective rehabilitative treatment for all sex offenders . . . [and] cause resentment and discontent among other participants, thus frustrating prison officials' goal of rehabilitation." (Mot. to Dismiss at 11-12.) Such an accommodation would obstruct the rehabilitative process, and is therefore not a valid remedy.

*Available alternatives at* de minimis *cost.* In *Turner*, the Court asserted:

> [T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test . . . . [I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Id.*, 482 U.S. at 90–91. In order to determine whether "obvious, easy alternatives" exist, "a plaintiff challenging a prison regulation must first affirmatively argue the existence of a *specific* alternative. It is not the court's job to speculate about 'every conceivable alternative method of accommodating the claimant's constitutional complaint.'" *Spies v. Voinovich,* 173 F.3d 398, 404 (6th Cir. 1999) (emphasis in original).

In this case, the only alternative proposed by Plaintiff is for Defendants to waive the sexual history and polygraph requirements for participation in the sex offender treatment program. As discussed above, the state has a legitimate penological interest in these programs, and the sexual autobiography is a considered to be an essential

-12-

component of a successful treatment. That being the case, removing the requirement does not present a *de minimis* cost to the valid penological interests. Likewise, the state cannot offer assurances of immunity as an alternative to the current policy. As the *McKune* plurality noted:

> If the State had to offer immunity, the practical effect would be that serial offenders who are incarcerated for but one violation would be given a windfall for past bad conduct, a result potentially destructive of any public or state support for the program and quite at odds with the dominant goal of acceptance of responsibility. If the State found it was forced to graduate prisoners from its rehabilitation program without knowing what other offenses they may have committed, the integrity of its program would be very much in doubt. If the State found it had to comply by allowing respondent the same perquisites as those who accept counseling, the result would be a dramatic illustration that obduracy has the same rewards as acceptance, and so the program itself would become self-defeating, even hypocritical, in the eyes of those whom it seeks to help. The Fifth Amendment does not require the State to suffer these programmatic disruptions when it seeks to rehabilitate those who are incarcerated for valid, final convictions.

*Id.*, 536 U.S. at 47–48.

In sum, while Plaintiff has made the requisite showing that the CDOC administrative regulations violate his Fifth Amendment rights, the policies are nonetheless valid as they are reasonably related to legitimate penological interests. Accordingly, I find that Plaintiff's Fifth Amendment claim must be dismissed.

### 2. The Due Process Claims (Claims I and III)

In Claim I, relying upon this court's decision in *Beebe v. Heil*, 333 F. Supp. 2d 1011 (D. Colo. 2004), Plaintiff claims that he has "a cognizable liberty interest [in state-mandated sex offender treatment] for due process purposes." (Am. Compl., ¶ 28.) Doe alleges that "The policies, which have caused the withholding of sex offender treatment, impinge upon Plaintiff's U.S. Constitution Fourteenth Amendment liberty interest in

-13-

continued treatment as a sex offender, whether in incarceration or on parole." (*Id.*, ¶ 29.) Doe further alleges in Claim I that, pursuant to the "reasonable relationship" test of *Turner*, the policies are not reasonably related to legitimate penological interests and are therefore invalid." (*Id.*, ¶¶ 30-31.)

In Claim III, Plaintiff alleges a Substantive Due Process claim in connection with his "cognizable liberty interest." (Am. Compl., ¶ 48.) This claim alleges that Defendants "have been deliberately indifferent to . . . [Plaintiff's] liberty interest [in continued sex offender treatment] and have deprived and continue to deprive Plaintiff of that interest in such a manner that their behavior is so egregious, so outrageous that it may fairly be said to shock the contemporary conscience of a federal judge . . . ." (*Id.*, ¶ 49.) In support of this claim, Plaintiff notes that he has been "kept out" of sex offender therapy for nearly four years. (*Id.* at ¶ 53).

I first find that these claims must be dismissed because I reject Doe's argument that he has been denied a liberty interest under the Due Process Clause by having sex offender treatment withheld. I find in that regard that Doe's reliance upon *Beebe* is misplaced. In *Beebe*, this court held that an inmate who is sentenced under Colorado's Lifetime Supervision of Sex Offender's Act has a "liberty interest in being afforded a due process hearing before being dismissed from treatment . . . ." *Id.*, 333 F. Supp. 2d at 1014. In that case, the inmate was dismissed from the sex offender treatment program required for parole eligibility without prior notice, explanation or "an opportunity to be heard by a neutral factfinder" despite the fact that the state was required "to provide convicted sex offenders with treatment during their imprisonment." *Id.* at 1012–13, 1016. The basis of Plaintiff's claims here are that he is entitled to receive treatment

while refusing to comply with program requirements.  Nothing in *Beebe* alludes to a liberty interest in those circumstances.  Further, unlike in *Beebe*, there is no indication that Doe is actually being "kept out" of the treatment program.  Rather, Doe is unwilling to fulfill the requirements for program re-admittance.  This being the case, the CDOC policy cannot be said to "shock the conscience" of federal judges.

Second, even if Plaintiff had sufficiently demonstrated a liberty interest, he must still overcome the *Turner* balancing test as he is alleging that a prison regulation impinges on his constitutional rights.  *See Wirsching*, 360 F.3d at 1198-99.  I found in regard to the Fifth Amendment claim that the government has a legitimate penological interest in the CDOC policies in question.  Accordingly, I reject Doe's argument that he satisfied the *Turner* test, and find that these claims must also be dismissed.

IV.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendants' Combined Motion to Dismiss filed April 16, 2010 (ECF No. 33) is **GRANTED** and this case is **DISMISSED**, each party to bear their own costs and fees.

Dated:  March 21, 2011

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge